Ismael Gonzalez,                             :
                            Petitioner       :
                                             :
            v.                               :
                                             :
Workers' Compensation Appeal                 :
Board (J.D. Eckman, Inc., and Travelers      :
Property Casualty Company of                 :
America),                                    :   No. 1806 C.D. 2014
                            Respondents       :   Submitted: March 27, 2015


BEFORE:    HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                              FILED: July 31, 2015


            Ismael Gonzalez (Claimant) petitions this Court for review of the
Workers' Compensation Appeal Board's (Board) September 10, 2014 order affirming
the Workers' Compensation Judge's (WCJ) decision denying and dismissing
Claimant's claim petition.  Claimant presents two issues for this Court's review: (1)
whether the WCJ erred in denying the claim petition after finding that Claimant
sustained a work-related injury; and, (2) whether the WCJ and the Board erred in
failing to find that Claimant's earnings loss was caused by J.D. Eckman, Inc.'s
(Employer) disregard of its Drug and Alcohol Policy (Drug Policy) and past
practices.  After review, we affirm.

            Claimant was employed full-time as a laborer for Employer beginning
on April 1, 2011.  He completed his 90-day probationary period on or about July 1,
2011.  On July 6, 2011, Claimant suffered a work-related low back strain.  Claimant

reported the injury when it occurred, and his supervisor Dave Garner (Garner) took him to WorkNet where, in addition to being treated, Claimant was given a drug and alcohol test. Claimant returned to work the same day and continued to work thereafter. WorkNet notified Claimant and Employer on or about July 11, 2011 that Claimant's drug test had been positive for cocaine. On July 12, 2011, Employer's safety director and drug and alcohol program administrator Richard Wittlinger (Wittlinger) met with Claimant to discuss the test results. By July 15, 2011 letter, Employer notified Claimant that his employment was terminated effective immediately due to Claimant's verified, positive drug test and his "admission of [his] intent to conceal [his] drug use . . . ." Reproduced Record (R.R.) at 79a.

On July 20, 2011, Employer filed a medical-only Notice of Temporary Compensation Payable (NTCP) for Claimant's July 6, 2011 low back strain. The NTCP was converted to a Notice of Compensation Payable (NCP) on October 11, 2011. On December 1, 2011, Claimant filed a claim petition seeking total disability benefits from July 6, 2011 for a lumbar strain/sprain and added left S-1 radiculopathy, related medical bills and counsel fees. WCJ hearings were held on February 7 and June 5, 2012. By June 28, 2013 decision, the WCJ denied and dismissed the claim petition because Claimant failed to prove that he sustained any injury other than his accepted low back strain. The WCJ also terminated Claimant's benefits effective May 31, 2012 due to his full recovery. Claimant appealed to the Board which affirmed the WCJ's decision on September 10, 2014. Claimant appealed to this Court.[1]

Claimant argues that the WCJ erred in denying the claim petition after finding that Claimant sustained a work-related injury. "In a claim petition, the

---

[1] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

2

burden of establishing a right to compensation and of proving all necessary elements to support an award rests with the claimant." *Coyne v. Workers' Comp. Appeal Bd. (Villanova Univ.)*, 942 A.2d 939, 945 (Pa. Cmwlth. 2008). Specifically, "[i]t is the claimant's burden to prove, by substantial evidence, that []he was injured in the course and scope of employment and that as a result of the injury []he was disabled." *Waronsky v. Workers' Comp. Appeal Bd. (Mellon Bank)*, 958 A.2d 1118, 1123 (Pa. Cmwlth. 2008). "[W]hen there is no obvious causal connection between the injury and the alleged work-related cause, unequivocal medical evidence is necessary to establish that connection." *Wagner v. Workers' Comp. Appeal Bd. (Ty Constr. Co., Inc.)*, 83 A.3d 1095, 1098 (Pa. Cmwlth. 2014). "Medical testimony is equivocal if it is less than positive or merely based upon possibilities. In determining whether the medical testimony is equivocal, we must review the medical testimony as a whole." *Potere v. Workers' Comp. Appeal Bd. (Kemcorp)*, 21 A.3d 684, 690 (Pa. Cmwlth. 2011) (citation omitted).

At the WCJ hearings, in support of his expanded work injury claim, Claimant presented the deposition of neurosurgeon Devanand A. Dominique, M.D. (Dr. Dominique). Dr. Dominique testified that he treated Claimant for the first time on March 5, 2012 for complaints of constant and chronic low back and leg pain with associated numbness and tingling, which Claimant specifically related to his July 6, 2011 work injury. Based primarily upon his review of Claimant's test results, including a discogram, Dr. Dominique diagnosed Claimant with an L4-L5 herniation for which he recommended surgery.[2] He stated that Claimant's July 3, 2012 surgery

---

[2] Dr. Dominique admitted that the records he relied upon were "pretty much [his] own," and he only "get[s] some information from referring doctors[.]" Supplemental Reproduced Record (S.R.R.) at 108b. Although he did not specifically recall what records he reviewed, he related that he most commonly reviews his office intake sheet, a work injury report and diagnostic studies. *See* S.R.R. at 113b-114b. He acknowledged that he did not see Claimant's July 6, 2011 WorkNet report until he prepared for his deposition. *See* S.R.R. at 114b-115b.

confirmed his diagnosis. When asked whether Claimant sustained a work-related injury on July 6, 2011, Dr. Dominique responded:[3]

> Well, you know, the simple answer is yes. The more complex answer is I don't play detective. You know, causality is to [sic] the attorneys and the judge. His story is very much in keeping with what I find on examination. I think he's an honest fellow, and what he's telling me is that prior to surgery, prior to the injury, he did not have back problems. He had an injury at work, and since that time he has had progressive back symptoms, which continued to worsen until surgery.

Supplemental Reproduced Record (S.R.R.) at 110b. Dr. Dominique explained that Claimant had a 20-pound lifting restriction and was attending physical therapy to strengthen his muscles and improve his flexibility, and he was not ready to return to work. When asked whether Claimant has had those restrictions since July 6, 2011, Dr. Dominique stated:

> I can't say one way or the other. Certainly, right now the restrictions he's on are because of me and because of the surgery that he had, but I do understand that he was having trouble before I saw him and was under some kind of restrictions from my recollection.

S.R.R. at 111b.

Dr. Dominique acknowledged that Claimant's July and September 2011 medical records do not reflect any radiculopathy. He could not say whether he knew what Claimant's job was at the time of his injury. He agreed that the type of symptoms Claimant had in March 2012 could be related to trauma but, most often, are a progressive, age-related phenomenon, and that Claimant had not experienced radiculopathy within the first few months of his injury. He further acknowledged that

---

[3] Notably, Claimant's counsel asked Dr. Dominique a question already resolved by the NCP. Counsel did not ask whether Claimant's L4-L5 condition resulted from the July 6, 2011 work injury, which was the issue in dispute.

there was no evident herniation even as of December 2011, and that Claimant's discogram does not reflect when symptoms arose. He pronounced, however, that "even if . . . he had an entirely degenerative phenomenon, it only became symptomatic at that time of the work-related injury." S.R.R. at 122b.

Employer presented the testimony of neurosurgeon William J. Beutler, M.D. (Dr. Beutler), who reviewed Claimant's medical records (including his MRI, x-rays, a discogram and EMGs), obtained details regarding his work injury and performed an independent medical evaluation (IME) on May 31, 2012. Dr. Beutler recalled Claimant describing low back pain that radiated into his left buttock and left leg to his knee, and left leg weakness for which he took Vicodin daily. Dr. Beutler recounted, however, that Claimant's "exam was normal," in that Claimant exhibited normal strength, sensation and reflexes in his upper and lower extremities and good range of motion in his back. S.R.R. at 32b. Dr. Beutler did observe that Claimant had mild, degenerative disk changes at L4-L5 that were consistent with Claimant's December 27, 2011 lumbar spine MRI, but offered that "[i]t didn't have anything to do with his symptoms." S.R.R. at 34b.

Dr. Beutler further testified that an EMG conducted on October 27, 2011 reflected that Claimant had mild left S-1 radiculopathy, but since Claimant had no radicular problems immediately after his July 6, 2011 injury, and the radiculopathy was on the right (opposite) side, Dr. Beutler concluded that the S-1 radiculopathy was "completely contrary to anything happening at work in July of 2011" and "d[id]n't have any relevance to this [July] lifting injury[.]" S.R.R. at 36b. Dr. Beutler explained that Claimant's S-1 radiculopathy had resolved by the time of a February 21, 2012 EMG, but since it reflected bilateral L4-L5 radiculopathy (on both sides and 2 disk levels different than the first EMG), he concluded that "[Claimant's] disks were developing some problems" over time for which he had been receiving appropriate medical treatment. S.R.R. at 37b.

5

Dr. Beutler testified that in order for there to be a connection between Claimant's July 2011 injury and his March 2012 symptoms and subsequent L4-L5 disk herniation surgery, the disk would have exhibited significant trauma (*i.e.*, a tear or collapse), and Claimant would have had persistent and consistent symptoms early on for which he would have had to sought treatment. Dr. Beutler recognized that, instead, Claimant had minimal findings when he treated at WorkNet on July 6 and 13, 2011, he did not seek treatment again until September 20, 2011, his treatments thereafter were minimal, his pain was controlled with Advil, and he did not report radiating symptoms until January 3, 2012. He also stated that the L4-L5 symptoms were, most often, related to aging. Dr. Beutler opined within a reasonable degree of medical certainty that Claimant suffered a lumbar strain on July 6, 2011 that resolved by May 31, 2012 and, as a result, Dr. Beutler declared that Claimant had no work restrictions related to his accepted injury. Dr. Beutler described that his only dispute with Dr. Dominique's conclusions is the relationship of Claimant's L4-L5 symptoms and surgical intervention to Claimant's work injury.

The law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000). Thus, neither the Board nor the Court may review the evidence or reweigh the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001). In addition, the reasoned decision requirement of "Section 422(a) [of the

6

Workers' Compensation Act (Act),[4] 77 P.S. § 834,[5]] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. Unless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal." *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006) (citation omitted).

Moreover, "it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd)*, 933 A.2d 1095, 1101 (Pa. Cmwlth. 2007) (quoting *Minicozzi v. Workers' Comp. Appeal Bd. (Indus. Metal Plating, Inc.)*, 873 A.2d 25, 29 (Pa. Cmwlth. 2005)). "We review the entire record to determine if it contains evidence a reasonable mind might find sufficient to support the WCJ's findings. If the record contains such evidence, the findings must be upheld even though the record contains conflicting evidence." *Lahr Mech.*, 933 A.2d at 1101 (citation omitted). Finally, this Court has held:

> Substantial evidence is such relevant evidence as a
> reasonable person might accept as adequate to support a

---

[4] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

[5] Section 422(a) of the Act provides, in pertinent part:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence.

77 P.S. § 834.

conclusion. In performing a substantial evidence analysis, this court must view the evidence in a light most favorable to the party who prevailed before the factfinder. Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.

*3D Trucking Co., Inc., v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (quoting *Waldameer Park, Inc. v. Worker' Comp. Appeal Bd. (Morrison),* 819 A.2d 164, 168 (Pa. Cmwlth. 2003) (citatitons omitted)).

Here, the WCJ found Dr. Beutler's testimony credible because it was "clear, concise, logical, and internally consistent and he did a thorough review of the medical records." WCJ Dec. at 6. The WCJ deemed Dr. Dominique's testimony "incredible because it [wa]s contrary to the credible and persuasive testimony of Dr. B[eu]tler." WCJ Dec. at 4. Based upon the evidence he deemed credible, the WCJ concluded: "Claimant has failed to sustain his burden of proving by substantial competent and credible evidence that he sustained any injury other th[a]n the low back strain that was the work injury of July 6, 2011 and accepted in the NTCP [and NCP]." WCJ Dec. at 6. On appeal, the Board held, in relevant part:

> After careful review, we determine the WCJ did not err in denying Claimant's [c]laim [p]etition and terminating benefits as of May 31, 2012. **Where his injury was already accepted by medical[-]only NCP, it was Claimant's burden to establish the work-relatedness of his . . . additional injuries. . . .** The credited testimony of Dr. Beutler established that Claimant did not have any restrictions relative to his work injury.

Board Op. at 6-7 (citations omitted; emphasis added). Because this Court may not reweigh the evidence or the WCJ's credibility determinations, and viewing the substantial, credible evidence in a light most favorable to Employer, as we must, we hold that the WCJ did not err in denying the claim petition after finding that Claimant

8

sustained a work-related injury. Accordingly, the Board properly affirmed the WCJ's conclusion that Claimant's S-1 radiculopathy was not related to his July 6, 2011 work injury, and that Claimant was recovered from his accepted work injury as of May 31, 2012. Under the circumstances, Claimant is not entitled to medical benefits or costs related thereto.

Claimant also argues that the WCJ and the Board erred in failing to find that Claimant's earnings loss was caused by Employer's disregard of its Drug Policy and past practice of permitting similarly-situated employees to participate in a drug program and keep their jobs.[6] Specifically, Claimant contends that "[b]y ignoring [] Employer's improper, selective, and discriminatory application of its own [Drug P]olicy, [the WCJ] failed to explain the basis for his credibility determinations and did not reach a reasoned decision." Claimant Br. at 16. He further claims that "[t]he WCJ inexplicably gave greater weight to [Wittlinger's] testimony . . . even though he provided incompetent, incredible testimony on the determinative fault issue . . . ."[7] Claimant Br. at 18.

---

[6] Initially, we agree that the WCJ did not specifically conclude whether Claimant's earnings loss was due to his work-related injury. However, in light of the WCJ's conclusion that Claimant failed to prove "that he sustained any injury other th[a]n the low back strain . . . accepted in the [NCP,]" WCJ Dec. at 6, Claimant failed to "prov[e] all necessary elements to support an award[,]" so the WCJ did not need to reach the issue of whether his disability was due to the injury or his discharge. *Coyne*, 942 A.2d at 945. However, in the interest of comprehensive analysis, we will address that issue.

Moreover, Employer's contention that Claimant waived these claims by not raising them on appeal to the Board is not supported by the record. Although we agree that Claimant failed to raise those specific arguments to the WCJ and the Board, we find that testimony at the WCJ hearing, and Claimant's statements in his appeal brief that Employer's failure to enroll Claimant in the drug program as required under its policies, and that Claimant was the only employee who had been denied the opportunity to participate in the drug program, fairly encompass those claims.

[7] Claimant did not dispute the authenticity of his positive drug test before the WCJ or the Board. Rather, Claimant's July 6, 2011 positive drug test result, and its accompanying custody and control and testing forms were admitted without objection. *See* R.R. at 47a-48a; *see also* S.R.R. at 211b-214b. Because Claimant here argues for the first time that Employer "failed to confirm the accuracy of [Claimant's] urine sample through the production of an authenticated drug test and the testimony of a qualified expert," his argument is waived. Claimant Br. at 18; *see Mearion v.*

For purposes of the Act, "'disability' means a loss of earning power . . . ." *Brewer v. Workers' Compensation Appeal Bd. (EZ Payroll & Staffing Solutions)*, 63 A.3d 843, 848 (Pa. Cmwlth. 2013). "Workers' compensation benefits are not intended as a remedy where the claimant's loss in earnings is attributable to factors other than the work injury." *Battles v. Workers' Comp. Appeal Bd. (Pittsburgh Steelers Sports, Inc.)*, 82 A.3d 477, 480 (Pa. Cmwlth. 2013).

> Where the claimant's loss of earnings is a result of a termination for misconduct unrelated to the injury, the requirement of causal connection to the work-related injury cannot be satisfied and claimant is not entitled to disability benefits for that loss. For a termination to bar disability benefits, the employer must show that the termination was for conduct that amounts to bad faith or a lack of good faith on the part of the claimant.

> If the employer has . . . work within the claimant's physical limitations at no loss of pay and has shown that the claimant was terminated for conduct evidencing bad faith or a lack of good faith, disability benefits must be denied, regardless of whether the claimant has a physical disability caused by the work-related injury. Under such circumstances, the claimant is not entitled to workers' compensation disability benefits because 'his loss of earnings subsequent to the discharge was caused by his own action, not by the work injury.' *Edwards* [*v. Workers' Comp. Appeal Bd. (Sear's Logistic Servs.*], 770 A.2d [805,] 808 [(Pa. Cmwlth. 2001).] . . . Violation of an employer's substance abuse policy constitutes conduct that amounts to lack of good faith on the part of the claimant and a claimant terminated for such conduct is not entitled to disability benefits for that loss.

*BJ's Wholesale Club v. Workers' Comp. Appeal Bd. (Pearson)*, 43 A.3d 559, 563 (Pa. Cmwlth. 2012) (citations omitted).

---

*Workers' Comp. Appeal Bd. (Franklin Smelting & Refining Co.)*, 703 A.2d 1080, 1081 (Pa. Cmwlth. 1997) ("[A]n issue not raised before the WCJ has been waived."). Even if Claimant had not waived this argument, due to the lack of evidence and argument to support such a claim, we would nevertheless uphold the WCJ's findings that his July 6, 2011 drug test was positive for cocaine.

At the WCJ hearings, Wittlinger introduced Employer's Drug Policy, which reflects Employer's commitment to a drug-free workplace. *See* R.R. at 45a, 59a, 86a-102a. To that end, the Drug Policy, applicable to all employees, prohibits their use of illegal drugs, including cocaine. *See* R.R. at 88a-90a. The Drug Policy requires employees involved in job-related incidents involving "a reportable injury for workers' compensation purposes . . . to submit to drug and/or alcohol testing within a reasonable time following the accident." R.R. at 93a; *see also* R.R. at 53a. The Drug Policy makes clear that "[Employer] will take disciplinary action, up to and including termination from employment, against an employee for any violation of [the Drug Policy]." R.R. at 101a. It further states:

> [F]irst time offenders will be suspended without pay until . . . evaluated by a substance abuse professional who shall determine what assistance, if any, the employee needs in resolving problems associated with the misuse of . . . controlled substances. If the employee declines to undergo evaluation or participate in a recommended rehabilitation program, he/she will be terminated.

R.R. at 101a; *see also* R.R. at 68a. Wittlinger received Claimant's positive test results. *See* R.R. at 47a-48a; *see also* S.R.R. at 211b-214b. He met with Claimant on July 12, 2011 regarding the results and, thereafter, issued Claimant's termination letter.

Claimant admitted that he signed a Certification by Applicant on February 4, 2011, whereby he certified that he read and understood that "[i]n the event of employment: . . . [he was] required to abide by all rules and regulations of [Employer, that Employer] is committed to providing a drug-free workplace and that a positive drug test . . . may be grounds for termination of employment." Certified Record (C.R.), Notes of Testimony, February 7, 2012 (2/7/12 N.T.) Ex. D-1; *see also* R.R. at 24a-25a. Claimant also admitted to signing an Acknowledgement, whereby, he confirmed that Employer's Drug Policy was explained to him, he was provided

11

access to it and he understood it. C.R., 2/7/12 N.T. Exs. D-2, D-5; *see also* R.R. at 25a, 45a-46a. Claimant also acknowledged that Employer's stated reasons for terminating his employment consisted of his positive drug test and his admission to Wittlinger that he would refuse or not seek medical treatment in order to conceal his drug use. *See* R.R. at 13a, 27a-28a, 79a.

Claimant recounted Wittlinger informing him at the July 12, 2011 meeting that since Claimant's probationary employment period had ended, he could not fire Claimant. He claims Wittlinger gave him the option of entering a drug program. Claimant contends that he told Wittlinger that since he had not been using cocaine, he was not sure why the test was positive, but if participating in a drug program would keep him from losing his job, he would do it. He stated that Wittlinger was going to make some calls and set up his program interview, but he did not hear from him. Claimant recalled that when he contacted Wittlinger on July 20th to find out when he was to start the program, Wittlinger notified him that he had been fired. Claimant explained that he called Employer's owner Jenny Eckman, who told him her understanding was that he had opted not to take the drug program. He asserted that he never refused the drug program or declared an intention to conceal his drug use. Without providing specific instances, Claimant described that similarly-situated employees have been permitted to complete the drug program and keep their jobs.

Wittlinger recalled that, at the July 12, 2011 meeting, Claimant reported that he had been at a party where he had been drinking and did cocaine, but that he wished to keep his job. Wittlinger continued: "[Claimant] had a concern for being put into this position knowing . . . what our procedures are for injuries and doing post-accident drug testing and he made a comment that if he knew it was going to lead to this he would've waited to report it." R.R. at 56a. Wittlinger acknowledged telling Claimant on July 11, 2011 that he would review Employer's policy and

12

Claimant's eligibility for the drug program. He explained, however, that because Claimant's statement made him concerned that Claimant was "trying to play the system," he ultimately determined to discharge Claimant. R.R. at 57a.

Wittlinger explained that although Employer's Drug Policy generally affords first-time offenders a second chance, it also explicitly makes illegal drug use grounds for immediate termination depending upon the circumstances. He asserted that although Employer has afforded other employees the chance to enter a drug program and keep their jobs, Claimant's situation differed because of "his attempt to conceal it and play the system." R.R. at 58a, 64a, 67a. Wittlinger stated that under these specific circumstances, rather than suspending Claimant or offering him an independent test certification, he fired him.

Following a lengthy description of the record evidence, the WCJ declared Wittlinger's testimony credible, and found Claimant's testimony "credible except where it is contrary to the credible and persuasive testimony of [] Wittlinger." WCJ Dec. at 3. Because the WCJ witnessed the demeanor of both men as they testified, he was not required to articulate the objective basis for his credibility determinations in order to facilitate effective appellate review. *See Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043 (Pa. 2003); *see also Higgins v. Workers' Comp. Appeal Bd. (City of Phila.)*, 854 A.2d 1002 (Pa. Cmwlth. 2004).

Based upon the evidence he deemed credible, the WCJ specifically found that Claimant understood when he was hired that Employer had a drug-free workplace policy (Findings of Fact (FOF) 14, 25), that violations thereof could result in disciplinary action up to and including discharge (FOF 14), and that Claimant's employment was terminated due to a positive drug test and his admission that he would have refused medical treatment or waited to report his July 6, 2011 injury had he known the outcome (FOFs 7, 16, 26). The WCJ further found that rather than

13

disregarding its Drug Policy and past practice, Employer treated Claimant differently than other employees with positive drug test results because Employer believed based on Claimant's statements that Claimant was insincere about being drug free at work. (FOFs 8, 27, 28).

On appeal, the Board held, in relevant part:

> **[I]t was Claimant's burden to establish the work-relatedness of his disability. . . . Claimant failed to establish his loss of earnings was related to his work injury.** . . . [T]he credited testimony of [] Wittlinger established Claimant was discharged from employment for violation of [Employer's] [D]rug [P]olicy. The WCJ accepted [] Wittlinger's testimony after observing his demeanor and no further explanation is required. [] Wittlinger credibly explained that, although [Employer] has a drug treatment policy, it was discretionary; Claimant was not entitled to take advantage of such policy due to the circumstances surrounding his positive drug test. Therefore, Claimant failed to meet his burden of establishing a work[-]related disability.

Board Op. at 6-7 (citations omitted; emphasis added).

Because this Court may not reweigh the evidence or the WCJ's credibility determinations, and viewing the evidence in a light most favorable to Employer, as we must, we hold that the WCJ did not err in failing to specifically find that Claimant's earnings loss was caused by Employer's disregard of its Drug Policy and past practices. Accordingly, the Board properly affirmed the WCJ's decision.

Based upon the foregoing, we affirm the Board's order.

_____
ANNE E. COVEY, Judge

14

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ismael Gonzalez,                          :
                        Petitioner         :
                                           :
            v.                             :
                                           :
Workers' Compensation Appeal               :
Board (J.D. Eckman, Inc., and Travelers :
Property Casualty Company of               :
America),                                  :          No. 1806 C.D. 2014
                        Respondents        :

O R D E R

AND NOW, this 31st day of July, 2015, the Workers' Compensation Appeal Board's September 10, 2014 order is affirmed.

_____
ANNE E. COVEY, Judge